# IN THE COURT OF APPEALS OF IOWA

No. 17-0539
Filed August 15, 2018

**MICHAEL WEBSTER,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.


Michael Webster appeals the summary dismissal of his application for postconviction relief. **AFFIRMED.**


Alfredo Parrish and Adam C. Witosky of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kelli A. Huser, Assistant Attorney General, for appellee State.


Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Michael Webster appeals the summary dismissal of his application for postconviction relief. Upon our de novo review, we affirm.

### I. Background Facts and Proceedings.

In 2010, Michael Webster pled guilty to three counts of robbery in the second degree, in violation of Iowa Code section 711.3 (2010).[1] He was sentenced to ten years on each count, two of which were to run consecutively, resulting in a total sentence of twenty years of incarceration. At that time, the sentencing statute for second-degree robbery required those convicted of that offense to serve seven-tenths, or seventy percent, of the maximum term of their sentence before becoming eligible for parole or work release. *See* Iowa Code § 902.12(5) (2010); *Clayton v. Iowa Dist. Ct.*, 907 N.W.2d 824, 826 (Iowa Ct. App. 2017).

Section 902.12 was amended by the legislature in 2016, changing the mandatory-minimum sentence for second-degree robbery from seventy percent to "between one-half and seven-tenths" of the maximum term of the defendant's sentence. *Compare* Iowa Code § 902.12(5) (2010), *with* Iowa Code § 902.12(3); *see also Clayton*, 907 N.W.2d at 826. Thus, the amendment granted a sentencing court some discretion to reduce a mandatory minimum sentence from 70% to 50%. *See* Iowa Code § 902.12(3); *Clayton*, 907 N.W.2d at 826; *see also* Robert R. Rigg, 4 *Iowa Practice Series: Criminal Law* § 8:6 (2017-2018 ed.) (discussing the penalty for a second-degree-robbery conviction). However, the section as amended

---

[1] All references are to the 2016 Code of Iowa unless otherwise noted.

explicitly limited its application to convictions "that occur[red] on or after July 1, 2016." Iowa Code § 902.12(3).

After the amended section went into effect, Webster filed an application for postconviction relief (PCR), based upon the change in section 902.12. He claimed under the due process and equal protection clauses of the United States and Iowa Constitutions, he should be resentenced in light of the amendment to section 902.12(3). Thereafter, the State filed a motion for summary judgment and dismissal, *see id.* § 822.6, contending his PCR application was time-barred and the new sentencing requirements in section 902.12 were inapplicable to Webster. Webster resisted, arguing the amendment to section 902.12 was "a new substantive rule of constitutional law" that should be applied retroactively because of case law and in the interests of "fairness, justice, and Iowa and U.S. Constitutional rights of Due Process and Equal Protection." Following a hearing, the district court granted the State's motion for summary judgment, concluding the new statute does not apply retroactively, and the court dismissed Webster's PCR application.

## II. Discussion.

Webster now appeals the summary dismissal, arguing the district court erred in concluding the change in section 902.12 did not apply retroactively. He asserts the amendment creates classes of defendants that undermine the purpose of the amendment—"to reduce racial disparity in incarceration." He contends a strict-scrutiny constitutional analysis applies based upon the alleged racial-disparity statutory purpose and that higher standard of review necessitates

retroactive application of the amendment. Our review is de novo. *See Clayton*, 907 N.W.2d at 826; *see also Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018).

"Both the Fourteenth Amendment to the United States Constitution and article I, section 6 of the Iowa Constitution provide all citizens equal protection under the law." *Nguyen v. State*, 878 N.W.2d 744, 757 (Iowa 2016) (citing U.S. Const. amend. XIV; Iowa Const. art. I, § 6).[2] "A fundamental principle of equal-protection law is 'that similarly-situated persons be treated alike.'" *State v. Dudley*, 766 N.W.2d 606, 615 (Iowa 2009) (citation omitted). Specifically, "'the equal protection guarantee requires that laws treat all those who are similarly situated with respect to the purposes of the law alike.'" *Nguyen*, 878 N.W.2d at 757 (citation omitted). This does not mean states are denied

> the power to treat different classes of people differently. It does, however, deny states
>> the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . . ."

*State v. Mitchell*, 757 N.W.2d 431, 436 (Iowa 2008) (quoting *Reed v. Reed*, 404 U.S. 71, 75-76 (1971)). "The guarantee of equal protection does not require identical treatment as long as the distinctions between classes of people or classes of crimes are not arbitrarily drawn." 16B C.J.S. *Constitutional Law* § 1316

---

[2] Although we have discretion to consider a different standard under our state constitution, *see Nguyen*, 878 N.W.2d at 757, Webster does not suggest a divergent analysis or offer any reasons for a separate analysis. Consequently, we decline to consider a different state standard under the circumstances and resolve Webster's state and federal equal protection claims under the existing federal standards. *See, e.g.*, *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012); *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005).

(Westlaw 2018). Only where it is established a statute treats similarly situated persons differently do we move to the second step of the analysis—"what level of review is required—strict scrutiny or rational basis." *Wright v. Iowa Dep't of Corr.*, 747 N.W.2d 213, 216 (Iowa 2008).

### A. Similarly Situated.

"The first step in our equal protection analysis under the Iowa Constitution is to determine whether there is a distinction made between similarly situated individuals." *Nguyen*, 878 N.W.2d at 758.[3] Webster argues amended section 902.12 creates two classes of persons—those convicted of second-degree robbery before July 1, 2016 and those convicted on or after July 1, 2016. He concludes:

> Everyone in each group is similarly situated in that each has been convicted of the exact same crime. The level of offense has not changed, only how it is being punished. The difference in the time of the conviction is not a sufficient reason to string out the racial disparity any longer.

However, this court has previously determined that criminals convicted of second-degree robbery before July 1, 2016 are *not* similarly situated to those convicted of second-degree robbery on or after July 1, 2016. *See, e.g.*, *Clayton*, 907 N.W.2d at 826;[4] *see also Kelly v. State*, 17-0895, 2018 WL 2230554, at *2 (Iowa Ct. App. May 16, 2018) (citing *Clayton*, 907 N.W.2d at 822-30, and noting the Iowa Supreme Court denied further review of the case); *Monroe v. State*, 17-1266, 2018

---

[3] *But see State v. Biddle*, 652 N.W.2d 191, 202 (Iowa 2002) ("The first step in an equal-protection analysis is to determine the appropriate standard of review."); *see also Clayton*, 907 N.W.2d at 826 (citing *Biddle*, 652 N.W.2d at 202).

[4] As a published opinion, *Clayton* is controlling legal authority. *Compare* Iowa R. App. P. 6.904(2)(a) (2018) (referencing published opinions as "legal authorities," *with* Iowa R. App. P. 6.904(2)(c) ("Unpublished opinion or decision shall not constitute controlling legal authority.").

WL 2230724, at *2 (Iowa Ct. App. May 16, 2018) (citing *Clayton*, 907 N.W.2d at 828). As the *Clayton* court explained:

> "Our supreme court and the U.S. Supreme Court have both upheld classifications of litigants based on the status of their case—i.e., whether a litigant's direct appeal was made final before or after—a change in the law." *Hillman v. State*, No. 14-0158, 2015 WL 5278929, at *3 (Iowa Ct. App. Sept. 10, 2015). More specifically, our case law recognizes finality as a material distinction between classes of defendants for the purposes of determining whether a change in law should be made retroactive. *See Nguyen*, 878 N.W.2d at 758; *Everett v. Brewer*, 215 N.W.2d 244, 247 (Iowa 1974) ("[T]here is a rational basis for classifying appellants in accordance with whether their claim previously has been fully considered and adjudicated."). Because Clayton is not similarly situated to those defendants convicted on or after July 1, 2016, his equal protection argument fails. *See Varnum*[ *v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009)] ("[I]f plaintiffs cannot show as a preliminary matter that they are similarly situated, courts do not further consider whether their different treatment under a statute is permitted under the equal protection clause.").

907 N.W.2d at 828; *see also State v. Harrison*, 914 N.W.2d 178, 205 (Iowa 2018) (stating "[i]t is a well-settled law that substantive amendments to criminal statutes do not apply retroactively," citing *Nguyen*, 878 N.W.2d at 754-56, and stating parenthetically it held in *Nguyen* that "both the Iowa and Federal Constitutions only require 'retroactive application of *clarifications* to existing substantive law, not *changes* to substantive law"). Consequently, Webster's assertion that the two groups are similarly situated merely because both groups contain persons convicted of second-degree robbery is erroneous. Because Webster has not shown the two groups are similarly situated, he has not shown the protections afforded under the equal protection clauses are implicated. His claim fails as a matter of law, and summary dismissal was appropriate. *See* Iowa Code § 822.6; *see also Moon*, 911 N.W.2d at 142 ("We apply our summary judgment standards

to summary disposition of [PCR] applications. Therefore, on further review we will apply our summary judgment/disposition standards."); *Manning v. State*, 654 N.W.2d 555, 560 (Iowa 2002) (noting "the principles underlying summary judgment procedure apply to motions of either party for disposition of an application for [PCR] without a trial on the merits").

### B. Level of Review Required.

We also find, like in *Clayton*, that even if Webster was similarly situated to persons convicted of second-degree robbery on or after July 1, 2016, his equal protection claim would still fail. *See* 907 N.W.2d at 828. Only where a statute "classifies individuals 'in terms of their ability to exercise a fundamental right or when it classifies or distinguishes persons by race or national origin'" is the statute "subject to strict-scrutiny analysis." *Wright*, 747 N.W.2d at 216 (citation omitted). "All other statutory classifications are subject to rational-basis review in which case the defendant must show the classification bears no rational relationship to a legitimate government interest." *Id.*

Here, the disparate treatment complained of applies equally to all criminals convicted of second-degree robbery before July 1, 2016, regardless of race, gender, or national origin. *See Clayton*, 907 N.W.2d at 830. Consequently, a rational-basis review of the statute is required to determine its constitutionality. *See Wright*, 747 N.W.2d at 216; *see also Clayton*, 907 N.W.2d at 828-29. This review "defers to the legislature's prerogative to make policy decisions by requiring only a plausible policy justification, mere rationality of the facts underlying the decision and, again, a merely rational relationship between the classification and the policy justification." *Clayton*, 907 N.W.2d at 828-29.

Webster argues the legislature's decision *not* to make the amendment apply retroactively renders it irrational because the "classes created by the amendment undermine[] the purpose of the amendment," which he asserts was "to reduce the disproportionate incarceration of African Americans." Webster does not cite, nor do we find, any explicit legislative history of the amendment stating that was its purpose. In fact, the amendment to section 902.12 originated as H.F. 2064, "[a]n Act relating to the criminal offense of child endangerment resulting in the death of a child or minor, and providing penalties." *See* The Iowa Legislature BillBook, www.legis.iowa.gov/legislation/BillBook?ga=86&ba=HF2064 (last visited Aug. 13, 2018); *see also* Iowa H.J. 91, www.legis.iowa.gov/docs/publications/ HJNL/20160120_HJNL.pdf#page=3 (last visited Aug. 13, 2018). The March 3, 2016 Fiscal Note provided to the legislature on the initial bill estimated the amendment would minimally impact minorities. *See* Holly Lyons, *Fiscal Note*, Legislative Services Agency at 1 (Mar. 3, 2016), www.legis.iowa.gov/docs/ publications/FN/770094.pdf. H.F. 2064 was subsequently amended in the house and the senate, and the March 17, 2017 Fiscal Note, which included analysis of the amendment including changes to the robbery penalties, stated:

> [C]urrently Iowa Code section 902.12 requires a 70.0% minimum sentence be served before a person convicted of robbery in the second degree is eligible for parole or work release. The bill, as amended, will allow persons convicted of robbery in the second degree to be eligible for parole or work release if they have served between 30.0% and 70.0% of their sentence. This will become effective for individuals convicted after July 1, 2016.
> **Assumptions**
> . . . .
> New admissions after July 1, 2016, for robbery in the second degree convictions will be released at a mid-point between 30.0% and 70.0% of their sentence. A decrease in the prison population will not occur until FY 2022.

> . . . .
> **Minority Impact**
> . . . .
> The minority impact to change a 70.0% minimum sentence to a 30.0%-70.0% minimum sentence for robbery second degree will be favorable for the African-American community. It is estimated that the prison population will be reduced beginning in year six, and approximately 49.0% of those released earlier would be African American.

Holly Lyons, *Fiscal Note*, Legislative Services Agency at 1-2 (Mar. 17, 2016), www.legis.iowa.gov/docs/publications/FN/770356.pdf. The final Fiscal Note dated April 18, 2016 included fiscal analysis of the new additions to the bill, which allowed "nonviolent drug offenders (not evaluated as high-risk) to be eligible for parole after serving at least 50.0% of their mandatory minimum sentence as sentenced under Iowa Code section 124.401(1), paragraph a, b, or c." *See* Holly Lyons, *Fiscal Note*, Legislative Services Agency at 1 (Apr. 18, 2016), www.legis.iowa.gov/docs/publications/FN/782436.pdf. That part of the bill was to "be retroactive and impact current inmates as well as new prison admissions." *Id.* The change to the mandatory-minimum sentences for nonviolent drug offenders was expected to "reduce the disproportionate impact on minorities in the criminal justice system," explaining:

> As of 2014, 3.4% of Iowa's population was African American. Approximately 11.5% of new prison admissions of drug offenders sentenced to mandatory minimum terms is African American. Of those drug offenders currently in prison serving mandatory minimum terms, 17.8% are African American. Given this, it is estimated 14.6% of the inmates released under this proposal will be African American.

*Id.* at 2. It appears there were no further references to the robbery-penalty amendment. *See id.* 1-3. On May 12, 2016, the Governor signed into law H.F. 2064, "an Act relating to the criminal offenses of child endangerment and robbery

and criminal drug offenses, and providing penalties." 2016 Iowa Acts ch. 1104, § 8.

Webster cites the Correctional Policy Project's annual Iowa Prison Population Forecast, prepared by the Iowa Department of Human Rights, Division of Criminal & Juvenile Justice Planning. Webster points out that in the 2016 forecast for fiscal years 2016 to 2026, when the legislation was pending, the proposed change to the section was referenced in its brief discussion of racial disparity:

> It should be noted that, African-Americans are over represented in Iowa's prison population, but particularly so for § 902.12, 70 percent crimes. The total prison population is approximately 25.3% African-American. Of the 7,027 non-70 percent offenders in prison on June 30th 2015, 23.6% were African-American. Of the 1,169 70 percent offenders, 36.7% were African-American. In FY 2016, 42.6% of the new admissions for 70 percent crimes were African-American. Of the offenders entering prison to serve 70 percent sentences for Robbery, 56.3% were African-American (including 59.1% of the Robbery-1st admissions). It is also noteworthy that the percentage of African-Americans incarcerated from FY 2007-FY 2016 has increased by approximately 1.0% . . . .
>
> It has been mentioned in previous forecasts that it will be difficult to reduce the racial disparity in Iowa's prison population without somehow modifying 70-percent sentences. During the 2015 legislative session, HF2064 was passed which reduced the floor for Robbery-2nd offenders and established a Robbery-3rd offense, which is not subject to a mandatory term. The effects of this provision are expected to decrease the prison population in the coming years; however the effects are not yet realized in the current projected forecast.

Iowa Dep't of Human Rights, Div. of Crim. & Juvenile Justice Planning, *The Correctional Policy Project: Iowa Prison Population Forecast FY 2016-FY 2026* (2016) (hereinafter "*Forecast*"), at 3-4, 13, 18, www.humanrights.iowa.gov/sites/default/files/media/Iowa%20Prison%20Population%20Forecast%20FY%202016-FY%202026.pdf.

We do not find this sufficient to establish that the purpose of the amendment was only to reduce the disproportionate incarceration of African Americans. There can be no doubt, based upon the fiscal analyses and Forecast, the amendment may result in the reduction of the racial disparity. Nevertheless, the goal of the overall legislation, if there were just one, would appear to be a reduction in the overall incarceration of persons, race notwithstanding. *Clayton* discusses other plausible policy justifications for the legislature choosing to make the sentencing provision at issue prospective only:

> Sentencing is a legislative function. We afford broad deference to the legislature in setting the penalties for criminal conduct and in determining when the penalties are to go into effect. *See State v. Cronkhite*, 613 N.W.2d 664, 669 (Iowa 2000) ("Substantial deference is afforded the legislature in setting the penalty for crimes."); *State v. Jackson*, 204 N.W.2d 915, 917 (Iowa 1973); *State v. Stanley*, 344 N.W.2d 564, 567 (Iowa Ct. App. 1983). There is a strong policy justification for making ameliorative sentencing provisions prospective only. Beyond the administrative and financial burden of resentencing offenders, the State has a strong policy interest both in maintaining the integrity of sentences that were valid when imposed and in promoting the finality of sentences. *See Nguyen*, 878 N.W.2d at 758; *see also People v. Mora*, 214 Cal. App. 4th 1477, 154 Cal.Rptr.3d 837, 842 (2013); Burch v. Tennessee Dep't of Corr., 994 S.W.2d 137, 139 (Tenn. Ct. App. 1999). Clayton has not carried his burden in negating these plausible policy justifications for the legislature choosing to make the sentencing provision at issue prospective only.

*Clayton*, 907 N.W.2d at 828-29. Webster has not negated these plausible policy justifications to show there is not rational basis for the legislature choosing to make the sentencing provision at issue prospective only.

Finally, even assuming that the only reason for the legislative changes to 902.12 relating to the robbery penalties was to reduce the racial disparity in Iowa's prison population, the Fiscal Notes show the amendment was statistically likely to

reduce the racial disparity over time. There is no requirement that the efficacy of the legislation is immediate. As stated in *Clayton*,

> the mere fact that the legislature might not have extended as much relief as possible does not mean the failure to extend such relief makes the law irrational and in violation of the right to equal protection. Legislation is the progeny of the perfect policy and the politically possible. We will not hold legislation unconstitutional merely because it was not perfect.

907 N.W.2d at 830. Webster's claim that the statute must be applied retroactively because it does not meet the requirements of equal protection fails as a matter of law, and summary dismissal of his PCR application was appropriate. *See* Iowa Code § 822.6; *see also Moon*, 911 N.W.2d at 142.

### III. Conclusion.

Upon our de novo review, we conclude Webster failed to establish he was similarly situated to persons convicted of second-degree robbery on or after July 1, 2016. Moreover, Webster did not show a heightened-scrutiny analysis applied to his claim, nor did he establish there was no rational basis for the legislature's determination *not* to make the sentencing provision at issue prospective only. For all these reasons, we affirm the district court's summary dismissal of Webster's PCR application.

**AFFIRMED.**